**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

No. 09-4468

—————

WEST PENN ALLEGHENY HEALTH SYSTEM, INC.,

Appellant

v.

UPMC; HIGHMARK, INC.

—————

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-09-cv-00480
District Judge: The Honorable Arthur J. Schwab

—————

Argued September 15, 2010

Before: SLOVITER, BARRY, and SMITH, *Circuit Judges*

(Filed: November 29, 2010)

Barak A. Bassman
James T. Giles
Barbara W. Mather (argued)
Barbara T. Sicalides
Pepper Hamilton
18th & Arch Streets
3000 Two Logan Square
Philadelphia, PA  19103

Andrew K. Fletcher
Pepper Hamilton
500 Grant Street
50th Floor
Pittsburgh, PA  15219
        *Counsel for Appellant*

Jonathan M. Jacobson (argued)
Wilson, Sonsini, Goodrich & Rosati
1301 Avenue of the Americas
40th Floor
New York, NY  10019

Nilam A. Sanghvi
Nancy Winkelman
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA  19103

Paul H. Titus
Schnader Harrison Segal & Lewis

120 Fifth Avenue
2700 Fifth Avenue Place
Pittsburgh, PA  15222
        *Counsel for Appellee UPMC*

Daniel I. Booker (argued)
Jeffrey J. Bresch
Donna M. Doblick
Paul G. Eastgate
Reed Smith
Suite 1200
225 Fifth Avenue
Pittsburgh, PA  15222
        *Counsel for Appellee Highmark, Inc.*

_____

OPINION

_____

SMITH, *Circuit Judge.*

The plaintiff in this antitrust case is Pittsburgh's second-largest hospital system.  It sued Pittsburgh's dominant hospital system and health insurer under the Sherman Act and state law. The plaintiff asserts that the defendants violated sections 1 and 2 of the Sherman Act by forming a conspiracy to protect one another from competition.  The plaintiff says that pursuant to the conspiracy, the dominant hospital system used its power in the provider market to insulate the health insurer from competition, and in exchange the insurer used its power in the insurance

3

market to strengthen the hospital system and to weaken the plaintiff. The plaintiff also asserts that the dominant hospital system violated section 2 of the Sherman Act by attempting to monopolize the Pittsburgh-area market for specialized hospital services. Finally, the plaintiff asserts state-law claims for unfair competition and tortious interference against the dominant hospital system. The District Court dismissed the Sherman Act claims and, having done so, declined to exercise supplemental jurisdiction over the state-law claims. Because we conclude that the District Court erred in dismissing the Sherman Act claims, we will reverse in part, vacate in part, and remand for further proceedings.

## I. Facts

The following facts are alleged in the plaintiff's complaint. The District Court decided this case on a motion to dismiss. We accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

### A. Cast of Characters

This lawsuit involves three parties. The plaintiff West Penn Allegheny Health System, Inc. ("West Penn") is Pittsburgh's second-largest hospital system; it has a share of less than 23% of the market for hospital services in Allegheny County, which includes the City of Pittsburgh. The defendant

4

University of Pittsburgh Medical Center ("UPMC") is Pittsburgh's dominant hospital system. It enjoys a 55% share of the Allegheny County market for hospital services, and its share of the market for tertiary and quaternary care services exceeds 50%.[1] West Penn and UPMC are the two major competitors in the Allegheny County market for hospital services, and are the only competitors in the market for tertiary and quaternary care services. The defendant Highmark, Inc. is the dominant insurer in the Allegheny County market for health insurance.[2] Highmark's market share has remained between 60% and 80% since 2000.

## B. Pre-Conspiracy Conduct

In 2000, The Western Pennsylvania Healthcare System merged with several financially distressed medical providers,

---

[1] "Tertiary care" refers to highly sophisticated, specialized care. *See* Highmark Br. at 3 n.1. "Quaternary care" refers to "advanced levels of medicine which are highly specialized and not widely used." *Id.* at 4 n.2.

[2] Specifically, the relevant market with respect to Highmark is alleged to be the Allegheny County market for "health care financing and administration for private employers and individuals, including indemnity insurance, managed care products such as HMO, PPO, or POS plans, and third-party administration of employer self-funded health plans." JA 129. But in their briefs the parties have referred to this market as the Allegheny County market for health insurance, and we do the same.

5

including Allegheny General Hospital, to form West Penn. Highmark funded the merger with a $125 million loan. Highmark's largesse did not spring from a sense of altruism but was intended to preserve competition in the market for hospital services. Had the financially distressed providers comprising West Penn failed, UPMC would have attained nearly unchecked dominance in the market. This would not have been good for Highmark: the more dominant UPMC becomes, the more leverage it gains to demand greater reimbursements from Highmark. (Reimbursements are the payments insurers give to providers to cover services rendered to the insurers' subscribers.)

After the merger, Highmark and West Penn continued to enjoy a good relationship, as Highmark recognized that preserving West Penn was in its interests. Thus, Highmark encouraged investors to purchase bonds from West Penn, touting its financial outlook and the quality of its medical services. And in early 2002, Highmark gave West Penn a $42 million grant to invest in its facilities.

In contrast to Highmark, UPMC has been hostile to West Penn since its inception. UPMC opposed the merger creating West Penn: it intervened in the merger proceedings, filed an unsuccessful lawsuit to prevent Highmark from funding the merger, and attempted (with some success) to dissuade investors from purchasing West Penn bonds. UPMC's hostility towards West Penn continued after the merger. Since West Penn's

formation, UPMC executives have repeatedly said that they want to destroy West Penn, and they have taken action to further that goal on more than a few occasions. But more on that later. *See* Section I.E, *infra*.

Historically, UPMC has also had a bitter relationship with Highmark. For example, when UPMC demanded purportedly excessive reimbursement rates from Highmark, Highmark responded by forming Community Blue, a low-cost insurance plan. To participate in Community Blue, a hospital had to agree to accept reduced reimbursements, but would receive a higher volume of patients. West Penn participated in Community Blue, but UPMC did not, claiming that its reimbursement rates were too low. UPMC responded to Community Blue by forming its own health insurer, UPMC Health Plan. UPMC Health Plan has been Highmark's main competitor in the Allegheny County market for health insurance since its formation.

Moreover, Highmark and UPMC have faced off in litigation in the past. In a 2001 federal lawsuit, Highmark sued UPMC under the Lanham Act, asserting that UPMC had made false statements about Community Blue in an advertisement. The District Court agreed with Highmark and preliminarily enjoined dissemination of the advertisement; we affirmed on appeal. *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171–73 (3d Cir. 2001). In another 2001 lawsuit, Highmark sought to enjoin UPMC's proposed acquisition of a children's

7

hospital; Highmark claimed that the acquisition would violate the antitrust laws. The case ultimately settled, however, and UPMC acquired the hospital.

## C. The Conspiracy Begins; the Dynamics Change

In 1998, UPMC offered a "truce" to Highmark. Under the terms of the truce, each entity would use its market power to protect the other from competition. Highmark initially rejected UPMC's offer, criticizing it as an illegal "attempt to form a 'super' monopoly for the provision of health care in Western Pennsylvania in which [UPMC], the leading provider of hospital services, and Highmark, the leading health insurer, would combine forces." JA 95.

The complaint alleges, however, that in the summer of 2002, over the course of several meetings, Highmark reconsidered and decided to accept UPMC's offer of a truce. The complaint alleges that UPMC agreed to use its power in the provider market to prevent Highmark competitors from gaining a foothold in the Allegheny County market for health insurance, and in exchange Highmark agreed to take steps to strengthen UPMC and to weaken West Penn. The complaint offers the following factual allegations in support of the conspiracy claim.

UPMC engaged in conduct that effectively insulated Highmark from competition. First, it refused to enter into competitive provider agreements with Highmark's rivals. This

8

prevented the rivals from entering the Allegheny County health insurance market because, given UPMC's dominance, an insurer cannot succeed in the market without being able to offer a competitively-priced plan that includes UPMC as an in-network provider.[3]

Second, UPMC shrunk UPMC Health Plan (Highmark's main competitor in the insurance market). It cut the Health Plan's advertising budget and increased its premiums, which led to a sharp drop in enrollment. It also refused to sell the Health Plan to insurers interested in buying it, which might have revived it as a Highmark competitor. UPMC acknowledged that it decided to shrink the Health Plan as a result of negotiations with Highmark, in which Highmark had agreed to take Community Blue off the market.

Meanwhile, Highmark took action that enhanced UPMC's dominance. Most significantly, it paid UPMC supracompetitive reimbursement rates. To afford UPMC's reimbursements, Highmark had to increase its insurance premiums (which, according to West Penn, it was able to do without losing business because UPMC had insulated it from competition). Highmark, moreover, provided UPMC with $230

---

[3] In fact, United Healthcare tried to enter the Allegheny County insurance market in 2005 and 2006, but it was effectively prevented from doing so because UPMC would not offer it a competitive contract.

9

million to build a new facility for its children's hospital, $70 million of which was a grant and the remainder of which was a low-interest loan. In addition, Highmark vowed not to offer a health plan that did not include UPMC as an in-network provider. Thus, in 2004, Highmark eliminated its low-cost insurance plan, Community Blue, in which UPMC had declined to participate. With the elimination of a leading low-cost insurance plan, health insurance premiums in Allegheny County rose. Furthermore, in 2006, Highmark publicly supported UPMC's acquisition of Mercy Hospital, which, other than West Penn, was UPMC's only other competitor in the market for tertiary and quaternary care services. Finally, in 2006, Highmark leaked confidential financial information regarding West Penn to UPMC, "which in turn leaked a distorted version of the information to credit-rating agencies and to the business media in an attempt to destroy investor confidence in West Penn." JA 113.

In addition, Highmark essentially cut West Penn off from its financial support, thus hampering its ability to compete with UPMC. Highmark, for instance, repeatedly rejected West Penn's requests to refinance the $125 million loan that was used to fund the 2000 merger.[4] Although Highmark believed refinancing the loan made business sense, it declined to do so

---

[4] Even so, the loan agreement allowed West Penn to obtain financing elsewhere and to repay the loan early, which West Penn did in 2007. *See* JA 710–11.

10

out of fear that UPMC would retaliate against it for violating their agreement—an agreement that Highmark candidly admitted was "probably illegal." Highmark said that it was under a "constant barrage" from UPMC and that UPMC was "obsessed" with driving West Penn out of business. Highmark explained that if it helped West Penn financially, UPMC would allow one of Highmark's competitors to enter the Allegheny County insurance market or would sell UPMC Health Plan to a Highmark competitor. Indeed, UPMC had sent Highmark a letter containing such a warning. JA 107–09.

Moreover, Highmark maintained West Penn's reimbursement rates at artificially depressed levels and repeatedly refused to increase them. In 2005 and 2006, for example, West Penn asked Highmark for a general increase in its rates, which were originally set in 2002. Highmark initially acknowledged that West Penn's rates were too low and suggested that it would raise them, but it ultimately refused to follow through, explaining that it could not help West Penn because, if it did, UPMC would retaliate.

Finally, Highmark "discriminated against West Penn [] in the award of grants to improve the quality of medical care in" Allegheny County. In November 2005, for example,

> Highmark launched a program to provide grant dollars to improve the implementation of information technology in health care. The

11

program provided for grants of $7,000 per physician, with an aggregate limit of $500,000 per health system. Only two health systems in Western Pennsylvania employed enough physicians to be limited by the $500,000 cap: UPMC and West Penn []. Highmark waived the cap in UPMC's case, awarding a grant of $8 million. [But] Highmark consistently refused to raise the cap for West Penn. . . .

JA 113.

## D. The Effects of the Conspiracy

The conspiracy ended in 2007, when the Antitrust Division of the Department of Justice began investigating Highmark's and UPMC's relationship. During the years covered by the conspiracy, UPMC and Highmark reaped record profits. UPMC's net income rose from $23 million in 2002 to over $618 million in 2007, and Highmark's net income rose from $50 million in 2001 to $398 million in 2006. UPMC's increased revenue came largely from the "sweetheart" reimbursements it received from Highmark, and Highmark increased its earnings by raising premiums.[5] On the other hand,

_____

[5] For example, from 2002–2006, "health insurance premiums for single individuals in the Pittsburgh area rose approximately 55% and health insurance premiums for Pittsburgh families rose approximately 51%." JA 105. The increases in nearby regions were

12

West Penn struggled during the years covered by the conspiracy. It was forced to scale back its services, and to abandon projects to expand and improve its services and facilities. In essence, West Penn was unable to compete with UPMC as vigorously as it otherwise would have.

## E. UPMC's Unilateral Conduct

Besides the conspiracy with Highmark, UPMC has taken a number of actions on its own to weaken West Penn. Most significantly, UPMC has systematically "raided" key physicians from West Penn. Even before West Penn's formation, UPMC hired physicians, including neurosurgeons, oncologists, hand surgeons, cardiologists, gastroenterologists, pulmonologists, and primary care physicians from two of West Penn's predecessor hospitals, including Allegheny General. UPMC lured these physicians away by paying them salaries that were well above market rates. Although UPMC incurred financial losses because of the hirings (that is, it paid the physicians more money than they generated), it admitted that it was willing to do so in order to injure the hospitals.

UPMC's physician "raiding" has "continued unabated" since West Penn's formation. JA 117. In 2002, UPMC attempted to hire the entire anesthesiology staff of a West Penn hospital. UPMC did so even though its internal analysis showed

---

much lower.

13

that the raid would be unprofitable. As before, though, UPMC admitted that it was not trying to earn profits. It was trying to drive the hospital out of business. In the end, the anesthesiologists were lured away by UPMC's bloated salary offers. But they quit not long after joining UPMC, because UPMC lacked sufficient operating space to absorb them.

The complaint identifies many additional examples of so-called physician raiding. In 2003, UPMC hired two primary care practitioners from a West Penn hospital; UPMC admitted that it took the practitioners on in order to injure the hospital. In 2005, UPMC hired a surgical group from a West Penn hospital. In 2006, UPMC hired a radiologist, an orthopedic surgeon, a cardiovascular surgeon, and an entire vascular lab department from West Penn. UPMC was unable to absorb the cardiovascular surgeon and vascular lab staff. In 2008, UPMC took cardiovascular surgeons, cardiologists, and nine primary care physicians from West Penn. UPMC agreed to pay one of the primary care physicians roughly $500,000—a figure well above the revenue generated by the physician's practice and more than four times the salary he received at West Penn. In 2009, UPMC offered Allegheny General's key bariatric surgeon a bloated salary in an attempt to hire him away. In an internal email to UPMC's CEO, a UPMC executive said that if the surgeon joined UPMC, "[Allegheny General] will not have a sustainable bariatrics program unless they just merge it with [West Penn]." The executive also said that even if Allegheny General raised the surgeon's salary and persuaded him to stay,

14

at least UPMC "will have forced [Allegheny General] to incur higher costs." JA 120–21. The surgeon ended up leaving Allegheny General to join UPMC.

In other instances, UPMC tried unsuccessfully to lure physicians away from West Penn. Between 2002 and 2009, UPMC attempted to hire a cardiology group, a urology group, an anesthesiology staff, a radiology staff, a "premier podiatrist," and an endocrinology group from West Penn. UPMC did not need the additional physicians, and although the doctors remained with West Penn, they did so only after West Penn agreed to increase their salaries.

In addition to hiring physicians away from West Penn, UPMC has pressured community hospitals into entering joint ventures with it for the provision of oncology services. UPMC told the hospitals that unless they entered the joint ventures, it would build UPMC satellite facilities next to them, draining their business. Nearly every community hospital in the Pittsburgh metropolitan area (except those owned by West Penn) acquiesced and entered a joint venture with UPMC. These joint ventures function as exclusive-dealing arrangements, *i.e.*, the community hospitals refer all of their oncology patients to UPMC facilities. Moreover, under pressure from UPMC, many of the community hospitals have begun sending all of their tertiary and quaternary care referrals to UPMC facilities.

Finally, UPMC has repeatedly made false statements about West Penn's financial health in order to discourage investors from purchasing West Penn bonds. On one occasion, for example, UPMC disseminated "a book of false and defamatory information about West Penn['s] finances that was

15

printed in a format designed to appear as if it were authored by West Penn." JA 122. The book, which was distributed to investment bankers and credit-rating agencies, gave investors a distorted impression of West Penn's financial stability. On the whole, UPMC's efforts to forestall investment in West Penn were somewhat successful. Although West Penn has been able to issue debt when necessary, UPMC's disparagement has caused it to pay artificially inflated financing costs on the debt.

## II. Procedural History

On April 21, 2009, West Penn initiated this lawsuit in the United States District Court for the Western District of Pennsylvania. UPMC and Highmark filed motions to dismiss, but West Penn sought and was granted leave to submit an amended complaint, which it filed on August 28, 2009. The amended complaint (hereafter, "the complaint") includes five counts. Counts 1 and 2 assert that UPMC and Highmark violated sections 1 and 2 of the Sherman Act, respectively, by conspiring to protect one another from competition. Count 3 alleges that UPMC violated section 2 of the Sherman Act by attempting to monopolize the Allegheny County market for "acute care inpatient services," or, in the alternative, the Allegheny County market for "high-end tertiary and quaternary acute care inpatient services." JA 126. (For simplicity's sake, we will refer to the two collectively as the market for "specialized hospital services.") Counts 4 and 5 assert state-law claims against UPMC for unfair competition and tortious interference with business relations. The complaint requests damages, including treble and punitive damages, and injunctive relief, including an order requiring Highmark to "end any discrimination in reimbursement (both direct and indirect)

16

between UPMC and West Penn." JA 142.

On September 18, 2009, UPMC and Highmark filed renewed motions to dismiss. The defendants moved to dismiss the conspiracy claims on three bases. They argued (1) that the complaint fails adequately to allege an unlawful conspiracy, (2) that even if it does allege a conspiracy, it fails to allege that West Penn sustained an "antitrust injury" as a result of the conspiracy, and (3) that the conspiracy claims are time-barred.

UPMC urged the Court to dismiss the attempted monopolization claim on the ground that the complaint fails to allege "anticompetitive conduct," an element of such a claim. Finally, UPMC argued that if the Court dismissed the Sherman Act claims, it should decline to exercise supplemental jurisdiction over the state-law claims.

On October 29, 2009, the District Court issued a lengthy opinion dismissing the complaint in its entirety. First, the Court discussed the pleading standard that applies in complex cases, including in antitrust cases. Noting that discovery in complex cases is expensive and time-consuming, the Court stated that judges presiding over such cases have a duty to act as "gatekeepers." Although the Court did not elaborate on what it meant by this, it suggested that, in order to prevent complex cases lacking merit from proceeding to discovery, courts must subject pleadings in such cases to heightened scrutiny. After discussing the pleading standard—and taking on the role of gatekeeper—the Court proceeded to address the merits.

The Court dismissed the conspiracy claims on the ground that the complaint fails to allege a conspiracy. According to the

17

Court, the complaint "is long on innuendo and frequently repeats the buzz word that the defendants 'conspired,'" but ultimately fails to allege "any facts which evidence a concerted action." JA 55. The Court also concluded that the conspiracy claims are deficient because the complaint fails to allege that West Penn sustained an antitrust injury as a consequence of the conspiracy. With respect to the attempted monopolization claim, the Court agreed with UPMC that the complaint fails to allege anticompetitive conduct. Finally, after dismissing the federal claims, the Court declined to exercise supplemental jurisdiction over the state-law claims.[6]

West Penn filed this timely appeal.

### III. Jurisdiction and Standard of Review

The District Court had jurisdiction over the Sherman Act claims under 28 U.S.C. §§ 1331 and 1337(a), and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a). This Court has jurisdiction under 28 U.S.C. § 1291. Our review of a district court's ruling on a motion to dismiss is plenary.

---

[6] In reaching its decision, the District Court relied heavily on evidence extrinsic to the complaint. The general rule, of course, is that "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A limited exception exists for documents that are "*integral to or explicitly relied* upon in the complaint." *Id.* (emphasis in original and internal quotation marks omitted). No purpose would be served by examining each document that the District Court relied on and determining whether it was properly considered. But based on an initial review, we believe that the Court may have considered several documents which should not have been within its purview.

18

*Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 123 (3d Cir. 2010).

## IV. The Pleading Standard

Under Federal Rule of Civil Procedure 8, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court held that to satisfy Rule 8, a complaint must contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible. *Id.* at 556, 569 n.14; *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 246 (3d Cir. 2010); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556). In determining whether a complaint is sufficient, courts should disregard the complaint's legal conclusions and determine whether the remaining factual allegations suggest that the plaintiff has a plausible—as opposed to merely conceivable—claim for relief. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949–50 (2009); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

The District Court opined that judges presiding over antitrust and other complex cases must act as "gatekeepers," and must subject pleadings in such cases to heightened scrutiny. The District Court's gloss on Rule 8, however, is squarely at odds with Supreme Court precedent. Although *Twombly* acknowledged that discovery in antitrust cases "can be

19

expensive," 550 U.S. at 558, it expressly rejected the notion that a "'heightened' pleading standard" applies in antitrust cases, *id.* at 569 n.14, and *Iqbal* made clear that Rule 8's pleading standard applies with the same level of rigor in "'all civil actions,'" 129 S. Ct. at 1953. *See also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 167–68 (1993) (rejecting Fifth Circuit's adoption of a heightened pleading standard for civil rights cases alleging municipal liability); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1221 (3d ed. 2004) (noting that Rule 8's pleading standard applies with the same degree of rigor "in every case, regardless of its size, complexity, or the numbers of parties that may be involved").

It is, of course, true that judging the sufficiency of a pleading is a context-dependent exercise. *See Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 567–68; *Phillips*, 515 F.3d at 232. Some claims require more factual explication than others to state a plausible claim for relief. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 320 n.18 (3d Cir. 2010). For example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy. *See* A. Benjamin Spencer, *Understanding Pleading Doctrine*, 108 Mich. L. Rev. 1, 13–18 (2009). But, contrary to the able District Court's suggestion, this does not mean that *Twombly*'s plausibility standard functions more like a probability requirement in complex cases.

We conclude that it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases. We now turn to address whether West Penn's

20

complaint satisfies the plausibility standard. ___

## V. The Conspiracy Claims

West Penn asserts conspiracy claims under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Section 1 provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." Despite its seemingly absolute language, section 1 has been construed to prohibit only *unreasonable* restraints of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 58 (1911); *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993). Some agreements are so plainly anticompetitive that they are condemned *per se*; that is, they are conclusively presumed to unreasonably restrain trade. *E.g.*, *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–400 (1927) (horizontal agreements to fix prices); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990) (per curiam) (horizontal agreements to divide markets). Other agreements are condemned only if evaluation under the fact-intensive rule of reason indicates that they unreasonably restrain trade. *E.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (vertical agreements to maintain resale prices).

Section 2 imposes liability on "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2; *see also Howard Hess*, 602 F.3d at 253 (listing the elements of

21

a section 2 conspiracy claim).[7]

UPMC and Highmark defend the District Court's dismissal of the conspiracy claims on several bases. We address each in turn.

## A. Agreement

First, we address the defendants' argument that the conspiracy claims were properly dismissed because the complaint fails to allege an agreement. To prevail on a section 1 claim or a section 2 conspiracy claim, a plaintiff must establish the existence of an agreement, sometimes also referred to as a "conspiracy" or "concerted action." *Twombly*, 550 U.S. at 553; *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 & n.16 (3d Cir. 2005). An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984); *Howard Hess*, 602 F.3d at 254; *Gordon*, 423 F.3d at 208.

A plaintiff may plead an agreement by alleging direct or

---

[7] Commentators have noted that, to the extent it bans *conspiracies* to monopolize, section 2 is largely superfluous, as conspiracies to monopolize will usually—if not always—run afoul of section 1's prohibition of conspiracies that unreasonably restrain trade. *See, e.g.*, Mark T.L. Sargent, *Economics Upside-Down: Low-Price Guarantees as Mechanisms for Facilitating Tacit Collusion*, 141 U. Pa. L. Rev. 2055, 2109 (1993). Even so, the fact that Congress created a redundant cause of action is not a basis for dismissal. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 779–80 (7th Cir. 1999).

circumstantial evidence, or a combination of the two. If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled. *Ins. Brokerage*, 618 F.3d at 323 ("Allegations of direct evidence of an agreement, if sufficiently detailed, are . . . adequate."); *see also Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 219–20 & n.10 (3d Cir. 2008) (citing *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 466 (3d Cir. 1998)).

West Penn's theory on the conspiracy claims is that in the summer of 2002, UPMC and Highmark formed an agreement to protect one another from competition. West Penn asserts that UPMC agreed to use its power in the provider market to exclude Highmark's rivals from the Allegheny County health insurance market, and that in exchange Highmark agreed to take steps to strengthen UPMC and to weaken its primary rival, West Penn. We conclude that the complaint contains non-conclusory allegations of direct evidence of such an agreement.

The complaint alleges that in 2005, West Penn asked Highmark to refinance the loan that was used to fund the 2000 merger, that Highmark agreed that refinancing was a good idea, but that Highmark would not sign off on the refinancing. Highmark explained that if it helped West Penn out financially, UPMC, which was "obsessed" with driving West Penn out of business, would retaliate against it for violating their agreement—an agreement that Highmark admitted was "probably illegal." Indeed, UPMC had sent Highmark a letter warning that if it extended financial assistance to West Penn, UPMC would enter a provider agreement with a Highmark competitor, thus reducing Highmark's dominance in the

23

insurance market. The complaint also alleges that in 2005 and 2006, West Penn asked Highmark to increase its reimbursement rates, that Highmark acknowledged that the rates were too low and suggested that it would raise them, but that Highmark refused to follow through, explaining that if it increased West Penn's rates, UPMC would retaliate against it for violating their agreement. Finally, the complaint alleges that at an employees' meeting, UPMC's CEO admitted that he decided to shrink UPMC Health Plan as a result of "negotiations" with Highmark, during which Highmark had agreed to take Community Blue off the market. In all, these allegations of direct evidence are sufficient to survive a motion to dismiss on the agreement element. *See Ins. Brokerage*, 618 F.3d at 323.[8]

## B. Unreasonable Restraint

The defendants make a half-hearted argument that even if the complaint alleges that they formed a conspiracy to shield one another from competition, the section 1 claim is still deficient because the complaint does not allege that the conspiracy unreasonably restrained trade. We disagree. At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the relevant markets. *See Howard Hess*, 602 F.3d at 253; *Brown Univ.*, 5 F.3d at 668. Anticompetitive effects include increased prices, reduced output, and reduced quality. *Toledo Mack*, 530 F.3d at 226; *Brown Univ.*, 5 F.3d at 668–69.

---

[8] Because we conclude that the allegations of direct evidence are by themselves sufficient, we do not address the sufficiency of the circumstantial allegations. *See Ins. Brokerage*, 618 F.3d at 323.

Here, the complaint alleges that the relevant markets are, on one hand, the Allegheny County market for specialized hospital services and, on the other hand, the Allegheny County market for health insurance.[9] The complaint plausibly suggests that by denying West Penn capital, the conspiracy caused West Penn to cut back on its services (including specialized hospital services) and to abandon projects to expand and improve its services and facilities. The complaint also plausibly suggests that by shielding Highmark from competition, the conspiracy resulted in increased premiums and reduced output in the market for health insurance. These allegations are sufficient to suggest that the conspiracy produced anticompetitive effects in the relevant markets.[10]

## C. Antitrust Injury

We now turn to the defendants' argument that the conspiracy claims were properly dismissed on the ground that the complaint fails to allege antitrust injury. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), the Supreme Court held that an antitrust plaintiff must do more than show that it would have been better off absent the violation; the plaintiff must establish that it suffered an antitrust injury. An

_____

[9] The defendants do not challenge West Penn's definition of the relevant markets.

[10] In so concluding, we do not reach West Penn's argument that—given the horizontal aspect of the conspiracy, *i.e.*, UPMC's agreement to shrink UPMC Health Plan—the conspiracy is subject to *per se* condemnation. Even if the more demanding rule of reason applies, the complaint adequately alleges that the conspiracy stifled competition in the relevant markets.

antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful." *Id.* at 489. "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.*; *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 344 (1990) ("[An] injury, although causally related to an antitrust violation, nevertheless will not qualify as an 'antitrust injury' unless it is attributable to . . . a competition-*reducing* aspect or effect of the defendant's behavior.").

The antitrust-injury requirement helps ensure "that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for . . . damages." *Atl. Richfield*, 495 U.S. at 342; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 109–10 (1986) (declaring that "it is inimical to the antitrust laws to award damages for losses stemming from continued competition") (internal punctuation omitted); *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995) ("When the plaintiff's injury is linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly or when a competitor is forced out of the market, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition."); IIA Phillip E. Areeda, Herbert Hovenkamp et al., *Antitrust Law* ¶ 337a, at 82-83 (3d ed. 2007).

So, for example, in *Brunswick*, a group of bowling alleys sued a manufacturer of bowling equipment, claiming that the latter's acquisition of several financially distressed alleys

26

violated the antitrust laws. 429 U.S. at 479-80. The plaintiffs said that if the struggling alleys had been allowed to fail, their profits would have increased, as displaced bowlers would have patronized their alleys. *Id.* at 481. The Supreme Court held, however, that the plaintiffs had not sustained an antitrust injury. The acquisitions in question were unlawful, if at all, because they tended to give the defendant monopoly power in the bowling alley market. And the plaintiffs were complaining about profits lost as a result of continued competition (the defendant's rescuing the distressed alleys), not about injuries linked to reduced competition. The plaintiffs thus failed to establish antitrust injury. *Id.* at 487-89.

As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, *Carpet Group Int'l v. Oriental Rug Imps. Ass'n, Inc.*, 227 F.3d 62, 76–77 (3d Cir. 2000); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993); *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 95 (3d Cir. 1986), and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 320–21 (3d Cir. 2007); Areeda & Hovenkamp, *supra*, ¶ 339, at 123.

West Penn asserts that three aspects of the conspiracy caused it antitrust injury. First, West Penn says it was injured as a result of Highmark's decision to take Community Blue off the market. It explains that Community Blue subscribers often received treatment at West Penn hospitals and that it lost business when Community Blue was eliminated. West Penn's

27

injury in this regard, however, is not *antitrust* injury. As West Penn seems to acknowledge, Highmark's elimination of Community Blue violated the antitrust laws, if at all, because it tended to reduce competition in the Allegheny County market for health insurance and thus tended to cause, among other things, an increase in premiums. West Penn participates in the insurance market not as a consumer or a competitor but as a supplier—it sells hospital services to insurers. A supplier does not suffer an antitrust injury when competition is reduced in the downstream market in which it sells goods or services. *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 410, 415 (3d Cir. 1997); *SAS of P.R., Inc. v. P.R . Tele. Co.*, 48 F.3d 39, 44–45 (1st Cir. 1995); *Serfecz*, 67 F.3d at 597–98; *Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327–28 (3d Cir. 1992); *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1241–42 (3d Cir. 1987). Although a supplier may lose business when competition is restrained in the downstream market in which it sells goods and services, such losses are merely byproducts of the anticompetitive effects of the restraint. *See* Areeda & Hovenkamp, *supra*, ¶ 350c, at 237-38. We conclude, then, that West Penn did not sustain an antitrust injury based on the elimination of Community Blue.

Second, West Penn alleges that it sustained an antitrust injury based on Highmark's refusals to refinance the $125 million loan. It explains that Highmark's refusals caused it to incur inflated financing costs, which in turn deprived it of capital that it would have used to improve and expand its medical facilities. But even if Highmark would not refinance the loan, the loan agreement allowed West Penn to obtain financing elsewhere and to repay the loan early without

28

penalty.[11]   In fact, West Penn did so in 2007.   Because Highmark was just one of many possible sources of financing, we conclude that—even if it acted with anticompetitive motives—Highmark's refinancing refusals could not have been "competition-*reducing* aspect[s] . . . of the" conspiracy, *Atl. Richfield*, 495 U.S. at 344, and thus did not give rise to an antitrust injury. *See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 294 (2d Cir. 2006); *Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1338 (11th Cir. 1998) (defendant's refusal to provide the plaintiff financing with which to open her own business did not give rise to antitrust injury because plaintiff could have obtained financing from many other sources); *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1173–74 (9th Cir. 1988) (defendant's refusal to sell plaintiff surplus milk did not give rise to antitrust injury where "there were 'plenty' of other sources for surplus milk").

Finally, West Penn argues that it sustained an antitrust injury in the form of artificially depressed reimbursement rates. The complaint alleges that during the conspiracy, West Penn asked Highmark to renegotiate and raise its rates.   The complaint suggests that Highmark acknowledged that the rates were too low and initially agreed to raise them, but that Highmark refused to follow through, citing its agreement with UPMC, under which it was not to do anything to benefit West Penn financially.   West Penn asserts that the amount of the underpayments—*i.e.*,   the   difference   between   the

---

[11] Although this case is considered on a motion to dismiss, the loan agreement may be reviewed because it is integral to the complaint. *Burlington Coat*, 114 F.3d at 1426.

reimbursements it would have received in a competitive market and those it actually received—constitutes an antitrust injury. For their part, the defendants do not take issue with West Penn's suggestion that its reimbursement rates would have been greater absent the conspiracy. They argue, instead, that paying West Penn depressed reimbursement rates was not an element of the conspiracy that posed antitrust problems. They reason that low reimbursement rates translate into low premiums for subscribers, and that it would therefore be contrary to a key purpose of the antitrust laws—promoting consumer welfare—to allow West Penn to recover the amount of the underpayments. West Penn has it right.

Admittedly, had Highmark been acting alone, West Penn would have little basis for challenging the reimbursement rates. A firm that has substantial power on the buy side of the market (*i.e.*, monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services. *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 926–30 (1st Cir. 1984) (Breyer, J.); *Travelers Ins. Co. v. Blue Cross of W. Pa.*, 481 F.2d 80, 84 (3d Cir. 1973). This reflects the general hesitance of courts to condemn unilateral behavior, lest vigorous competition be chilled. *Am. Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2209 (2010); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000).

But when a firm exercises monopsony power pursuant to a conspiracy, its conduct is subject to more rigorous scrutiny, *see Am. Needle*, 130 S. Ct. at 2209, and will be condemned if it imposes an unreasonable restraint of trade, *see Standard Oil*, 221 U.S. at 58. "This is so because unlike independent action, 'concerted activity inherently is fraught with anticompetitive

30

risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle*, 130 S. Ct. at 2209 (quoting *Copperweld*, 467 U.S. at 768–69) (internal punctuation omitted).

Here, the complaint suggests that Highmark has substantial monopsony power.  It alleges that Highmark has a 60%–80% share of the Allegheny County market for health insurance, that there are significant entry barriers for insurers wishing to break into the market (including UPMC's unwillingness to deal competitively with non-Highmark insurers), and that medical providers have very few alternative purchasers for their services.[12]  The complaint also alleges that Highmark paid West Penn depressed reimbursement rates, not as a result of independent decisionmaking, but pursuant to a conspiracy with UPMC, under which UPMC insulated Highmark from competition in return for Highmark's taking steps to hobble West Penn.  In these circumstances, it is certainly plausible that paying West Penn depressed reimbursement rates unreasonably restrained trade.  Such short-changing poses competitive threats similar to those posed by conspiracies among buyers to fix prices, *see Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948), and other restraints that result in artificially depressed payments to suppliers—namely, suboptimal output, reduced quality, allocative inefficiencies, and (given the reductions in output) higher prices for consumers in the long run.  *See Brown v. Pro Football, Inc.*, 50 F.3d 1041, 1061 (D.C. Cir. 1995) (Wald, J.,

---

[12] Indeed, the complaint alleges that the only other insurer with a significant market share is UPMC Health Plan, and that UPMC Health Plan has basically been unwilling to deal with West Penn.

31

dissenting) (discussing the anticompetitive effects of monopsony) (citing Roger D. Blair & Jeffrey L. Harrison, *Monopsony* 36–43, 72 (1993)); Areeda & Hovenkamp, *supra*, ¶ 350b, at 234–235 & n.8; John J. Miles, *Health Care & Antitrust Law* § 15B:4 (2010) (collecting sources and discussing the problems linked to insurer monopsony); Roger D. Blair & John E. Lopatka, *Predatory Buying and the Antitrust Laws*, 2008 Utah L. Rev. 415, 415 (observing that the "exercise of monopsony power . . . misallocates resources and thereby reduces social welfare"); *see also St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n*, 712 F.2d 978, 985–87 (5th Cir. 1983) (prima facie antitrust violation shown where insurer that was controlled by participating hospitals limited reimbursements paid to non-participating hospitals).

The defendants argue, though, that Highmark's paying West Penn depressed reimbursements did not pose antitrust problems because it enabled Highmark to set low insurance premiums and thus benefitted consumers. We disagree. First, even if it were true that paying West Penn depressed rates enabled Highmark to offer lower premiums, it is far from clear that this would have benefitted consumers, because the premium reductions would have been achieved only by taking action that tends to diminish the quality and availability of hospital services. *See Brown*, 50 F.3d at 1061 (Wald, J., dissenting); Warren S. Grimes, *The Sherman Act's Unintended Bias Against Lilliputians*, 69 Antitrust L.J. 195, 210 (2001) ("The very nature of monopsony or oligopsony power is that it tends to suppress output and reduce quality or choice."). Second, the complaint alleges that Highmark did *not* pass the savings on to consumers. It alleges, instead, that Highmark pocketed the savings, while repeatedly ratcheting up insurance premiums. *See also* Roger D.

32

Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 339 (1991) (explaining that "lower input prices resulting from the exercise of monopsony power do not ultimately translate into lower prices to the monopsonist's customers").

But most importantly, the defendants' argument reflects a basic misunderstanding of the antitrust laws. The Ninth Circuit's discussion in *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979 (9th Cir. 2000), illustrates the point well. There, the plaintiff milk producers established that the defendant cheese makers had conspired to depress the price they paid for milk. The cheese makers argued that the plaintiffs' injuries were not antitrust injuries—*i.e.*, were not the kind of injuries "the antitrust laws were intended to prevent," *Brunswick*, 429 U.S. at 489—because the conspiracy enabled them to purchase milk at lower costs and thus to sell cheese to consumers at lower prices. *Knevelbaard Dairies*, 232 F.3d at 988. The Ninth Circuit properly rejected this argument:

> The fallacy of th[e defendants'] argument becomes clear when we recall that the central purpose of the antitrust laws . . . is to preserve competition. It is competition—not the collusive fixing of prices at levels either low or high—that these statutes recognize as vital to the public interest. The Supreme Court's references to the goals of achieving "the lowest prices, the highest quality and the greatest material progress," [*N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958)], and of "assur[ing] customers the benefits of price competition," [*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983)], do not

33

mean that conspiracies among buyers to depress acquisition prices are tolerated. Every precedent in the field makes clear that the interaction of competitive forces, not price-rigging, is what will benefit consumers.

*Id.*; *see also Mandeville*, 334 U.S. at 235. Similar reasoning applies here. Highmark's improperly motivated exercise of monopsony power, like the collusive exercise of oligopsony power by the cheese makers in *Knevelbaard*, was anticompetitive and cannot be defended on the sole ground that it enabled Highmark to set lower premiums on its insurance plans.

Having concluded that paying West Penn artificially depressed reimbursement rates was an anticompetitive aspect of the alleged conspiracy, it follows that the underpayments constitute an antitrust injury. *See Atl. Richfield*, 495 U.S. at 334 (holding that an antitrust injury is an injury that is "attributable to an anti-competitive aspect of the practice under scrutiny"); *Brunswick*, 429 U.S. at 489; Areeda & Hovenkamp, *supra*, ¶ 350, at 235 (noting that "sellers receiving illegally low prices . . . suffer antitrust injury").

D. Statute of Limitations[13]

---

[13] Although Federal Rule of Civil Procedure 8(c) suggests that "a statute of limitations defense cannot be used in the context of a Rule 12(b)(6) motion to dismiss," *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.1 (3d Cir. 1994), our cases recognize that a defendant may raise a limitations defense in a motion to dismiss, *Robinson v. Johnson*, 313 F.3d 128, 135 & n.3 (3d Cir. 2002) (citing cases). For the defendant to prevail, though, the plaintiff's tardiness in bringing the action must be apparent from the

Highmark argues that the conspiracy claims are time-barred. Under 15 U.S.C. § 15b, a suit to recover damages for a violation of the Sherman Act must be "commenced within four years after the cause of action accrued." In *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), the Supreme Court declared that an antitrust cause of action generally "accrues and the statute [of limitations] begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* at 338. However, "[i]n the context of a continuing conspiracy to violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." *Id.*; *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1172 (3d Cir. 1993) ("[A]n injurious act within the limitations period may serve as a basis for an antitrust suit."); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189–90 (1997).

West Penn initiated this lawsuit on April 21, 2009, and so the limitations period extends back to April 21, 2005. *See* 15 U.S.C. § 15b. The complaint adequately alleges that the defendants performed injurious acts in furtherance of the conspiracy within the limitations period. The complaint alleges, for example, that as part of the conspiracy, Highmark refused to increase West Penn's reimbursement rates in 2006. On a straightforward reading of *Zenith*, it therefore appears that West Penn may, consistent with the statute of limitations, recover

face of the complaint. *Id.*

damages for the acts that occurred within the limitations period. *See* 401 U.S. at 338.

Highmark acknowledges all of this, but urges us to adopt a limitation on *Zenith*. Citing persuasive authority, Highmark asks us to hold that no cause of action accrues based on injurious acts that occur within the limitations period, if those acts are merely "reaffirmations" of acts done or decisions made outside the limitations period. *See* Highmark Br. at 38–46 (citing, *e.g.*, *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999)). Highmark says that under this standard West Penn's conspiracy claims are time-barred, because the acts that allegedly occurred within the limitations period were merely manifestations of decisions made or acts done outside the limitations period. We reject Highmark's proposed standard, as it is inconsistent with controlling precedent.

We start with *Hanover Shoe*. There, a shoe manufacturer sued a shoemaking machinery company for monopolization under section 2 of the Sherman Act. The manufacturer asserted that in 1912, the machinery company had established a lease-only policy for its most important equipment, under which it would lease—but would not sell—the equipment to manufacturers. 392 U.S. at 483. The manufacturer claimed that the lease-only policy had enabled the machinery company to maintain a monopoly in the market for shoemaking equipment, and that as a result, it had incurred artificially inflated costs in carrying out its business. *Id.* at 484. Although the manufacturer asserted that the lease-only policy had been established in 1912, it did not file suit against the machinery company until 1955. Citing the time gap, the machinery company asserted that the

36

suit was time-barred.  The Supreme Court disagreed:

> [The machinery company] has . . . advanced the argument that because the earliest impact on [the manufacturer] of [the machinery company's] lease only policy occurred in 1912, [the manufacturer's] cause of action arose during that year and is now barred by the applicable . . . statute of limitations. . . . [But w]e are not dealing with a violation which, if it occurs at all, must occur within some specific and limited time span. . . . Rather, we are dealing with conduct which constituted a continuing violation of the Sherman Act and which inflicted continuing and accumulating harm on [the manufacturer].  Although [the manufacturer] could have sued in 1912 for the injury then being inflicted, it was equally entitled to sue in 1955.

*Id.* at 502 n.15.  The Court so held even though the injurious acts that took place within the limitations period—*i.e.*, instances in which the machinery company persisted in its refusal to offer its equipment for sale—were simply manifestations of the lease-only policy, which had been established in 1912, well before the start of the limitations period.  *See id.*; *see also Klehr*, 521 U.S. at 189–90 (noting that in the context of a price-fixing conspiracy, any given sale gives rise to a cause of action to recover the damages caused by that sale); *Harold Friedman, Inc. v. Thorofare Mkts.*, 587 F.2d 127, 138–39 (3d Cir. 1978) (section 1 suit challenging shopping center's refusal to lease space to grocery store deemed timely, even though refusal was "grounded upon an exclusivity clause in a lease that was entered into [between the shopping center and a rival grocery store] more than four years before the commencement of the suit").

37

Our decision in *Lower Lake Erie* is along the same lines. There the plaintiffs, which included docking and transportation companies, sued a railroad under section 1 of the Sherman Act. The companies proved that the defendant had participated in a conspiracy among railroads to exclude the companies from the market for the handling and transportation of iron ore. 998 F.2d at 1153–54. The railroads had excluded the companies by, among other things, refusing to lease them dock property suitable for the shipment of iron ore, and by overcharging the companies to use the railroads to ship ore. *Id.* The defendant argued that because the conspiracy had gotten under way outside the limitations period, the companies' claims were time-barred. We disagreed, reasoning that the companies' claims were timely because the railroads' exclusionary conduct, including refusing to lease dock property and overcharging for use of the railroads, had continued into the limitations period. *See id.* at 1172; *accord Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186–87 (5th Cir. 1988); *Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1035, 1041–43 (5th Cir. 1977), *followed in Harold Friedman*, 587 F.2d at 139 & nn. 43–45; *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 127–28 (5th Cir. 1975). *But see, e.g.*, *David Orgell, Inc. v. Geary's Stores, Inc.*, 640 F.2d 936, 937–38 (9th Cir. 1981). Taken together, *Hanover Shoe* and *Lower Lake Erie* leave no room for Highmark's proposed rule. In each case, the plaintiff's suit was timely even though the acts that occurred within the limitations period were reaffirmations of decisions originally made outside the limitations period.

Finally, we note that the policies underlying limitations statutes—namely, providing potential defendants with repose and avoiding prejudice caused by lost evidence, faded

38

memories, and unavailable witnesses, *see Wilson v. Garcia*, 471 U.S. 261, 271–72 (1985)—do not counsel in favor of recognizing Highmark's proposed rule. As for repose, the Fifth Circuit said it well in *Poster Exchange*, where it rejected a rule strikingly similar to the one Highmark proposes here:

> [Adopting the defendant's rule] would . . . improperly transform the limitations statute from one of repose to one of continued immunity. For according to [the defendant's] argument, a plaintiff who suffers [damage from a continuing antitrust violation] is barred not only from proving violations and damages more than four years old, but is barred forever from complaining of [the continuation] of the unlawful conduct. The function of the limitations statute is simply to pull the blanket of peace over acts and events which have themselves already slept for the statutory period, thus barring the proof of wrongs embedded in time-passed events. Employing the limitations statute additionally to immunize recent repetition or continuation of violations and damages occasioned thereby not only extends the statute beyond its purpose, but also conflicts with the policies of vigorous enforcement of private rights through private actions.

517 F.2d at 127–28 (internal citations omitted). With regard to the policy of avoiding prejudice, the defendants "hardly are in a position to argue for the protection of the statute of limitations on the traditional ground that evidence has been lost, memories have faded, and witnesses have disappeared . . . when it is the defendants' own recent conduct that results in a finding of a newly accruing cause of action." *Imperial Point*, 549 F.2d at

39

1041 (internal citations and punctuation omitted).

We thus end up where we started: *Zenith* should be applied on its terms. Under *Zenith*, West Penn's conspiracy claims are not time-barred because the complaint adequately alleges that the defendants performed injurious acts in furtherance of the conspiracy within the limitations period.

## VI. The Attempted Monopolization Claim

In addition to the conspiracy claims, West Penn alleges that UPMC violated section 2 of the Sherman Act by attempting to monopolize the Allegheny County market for specialized hospital services. The elements of attempted monopolization are (1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905); *Lepage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) (holding that a court should consider a defendant's anticompetitive conduct "as a whole rather than considering each aspect in isolation") (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). The District Court dismissed the attempted monopolization claim on the ground that the complaint fails to allege anticompetitive conduct, and the parties have addressed only that issue here. We limit our review accordingly.

Broadly speaking, a firm engages in anticompetitive conduct when it attempts "to exclude rivals on some basis other than efficiency," *Aspen Skiing Co. v. Aspen Highlands Skiing*

40

*Corp.*, 472 U.S. 585, 605 (1985) (internal quotation marks omitted), or when it competes "on some basis other than the merits," *Lepage's*, 324 F.3d at 147. "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." *Broadcom*, 501 F.3d at 308. The line between anticompetitive conduct and vigorous competition is sometimes blurry, but distinguishing between the two is critical, because the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *McQuillan*, 506 U.S. at 458; *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 429–30 (2d Cir. 1945).

"'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Lepage's*, 324 F.3d at 152 (quoting *Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998)). For present purposes, it is sufficient to note that anticompetitive conduct can include a conspiracy to exclude a rival, Areeda & Hovenkamp, *supra*, ¶ 806f3, at 428; *see Lepage's*, 324 F.3d at 157, hiring a rival's employees not to use them but to deny them to the rival, *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (per curiam); Areeda & Hovenkamp, *supra*, ¶ 702, at 205, a hospital's coercing providers not to refer patients to a rival, *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568, 576–77, 580 (6th Cir. 1986); *see M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp.*, 981 F.2d 160, 166–67 (4th Cir. 1992) (en banc), and making false statements about a rival to potential investors and customers, *see Lepage's*, 324 F.3d at 153 (citing

41

*Int'l Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980)); *Caribbean*, 148 F.3d at 1087; *see generally* Maurice E. Stucke, Symposium, *When a Monopolist Deceives*, 76 Antitrust L.J. 823 (2010).[14]

The complaint alleges the following anticompetitive conduct. First, the defendants engaged in a conspiracy, a purpose of which was to drive West Penn out of business. Second, UPMC hired employees away from West Penn by paying them bloated salaries. UPMC admitted to hiring some of the employees not because it needed them but in order to injure West Penn; UPMC could not absorb some of the employees and had to let them go; and UPMC incurred financial losses as a result of the hiring. These allegations are sufficient to suggest that at least some of the hirings were anticompetitive. *See Universal Analytics*, 914 F.2d at 1258 (Anticompetitive or predatory hiring "can be proved by showing the hiring was made with [anticompetitive] intent, i.e. to harm the competition without helping the [defendant], or by showing a clear nonuse

---

[14] We previously recognized—though perhaps in overly broad terms—that making false statements about a rival, without more, rarely interferes with competition enough to violate the antitrust laws. *See Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132 (3d Cir. 2005) (stating, in the context of a section 1 case, that "'deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned'"). But in some cases, such defamation, which plainly is not competition on the merits, can give rise to antitrust liability, especially when it is combined with other anticompetitive acts. *See Lepage's*, 324 F.3d at 153, 162; *Int'l Travel*, 623 F.2d at 1268, 1270; *Caribbean*, 148 F.3d at 1087.

in fact.").[15]  Relatedly, UPMC tried unsuccessfully to lure a number of employees away from West Penn; UPMC could not have absorbed the additional employees, and although the employees remained with West Penn, they did so only after West Penn raised their salaries to supracompetitive levels. Third, UPMC approached community hospitals and threatened to build UPMC satellite facilities next to them unless they stopped referring oncology patients to West Penn and began referring all such patients to UPMC.  Nearly all of the community hospitals caved in, which deprived West Penn of a key source of patients.  Moreover, under pressure from UPMC, several of the community hospitals have stopped sending *any* of their tertiary and quaternary care referrals to West Penn and have begun sending them all to UPMC.  Finally, on several occasions, UPMC made false statements about West Penn's financial health to potential investors, which caused West Penn to pay artificially inflated financing costs on its debt.

Viewed as a whole, these allegations plausibly suggest that UPMC has engaged in anticompetitive conduct, *i.e.*, that UPMC has competed with West Penn "on some basis other than the merits." *Lepage's*, 324 F.3d at 147.  The District Court erred in concluding otherwise.[16]

---

[15] UPMC argues that we may not consider hirings made outside the limitations period in determining whether the new hirings were anticompetitive.  Not so.  *Toledo Mack*, 530 F.3d at 217 (holding that it is proper to consider pre-limitations period conduct in determining whether conduct within the limitations period violated the antitrust laws).

[16] West Penn also claims that UPMC's acquisition of Mercy Hospital was anticompetitive.  It says that, besides West Penn, Mercy was UPMC's only other competitor in the market for specialized

43

## VII. The State-Law Claims

After dismissing the federal claims, the District Court declined to exercise supplemental jurisdiction over the state-law claims. Having determined that the federal claims were improperly dismissed, we will vacate the dismissal of the state-law claims for reconsideration by the District Court.

## VIII. Conclusion

For the reasons set forth above, the judgment of the District Court will be reversed in part and vacated in part, and the case will be remanded for further proceedings.

---

hospital services, and that the acquisition brought UPMC one step closer to monopoly. As UPMC points out, however, West Penn has failed to allege that it sustained an antitrust injury as a result of the acquisition, and thus may not challenge it. *See Alberta Gas*, 826 F.2d at 1241–42 (gas producer sustained no antitrust injury as a result of an acquisition of a potential competitor by another competitor); Areeda & Hovenkamp, *supra*, ¶ 348b, at 204.