**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 24-2943
_____

RENEE WOLF,
Appellant

v.

PROGRESSIVE PAIN MANAGEMENT, LLC; BRIAN BANNISTER, M.D.;
PENELOPE BANNISTER

_____

On Appeal from the United States District Court
for the District of New Jersey
District Court No. 3-23-cv-01866
District Judge:  Honorable Zahid N. Quraishi
_____

Submitted under Third Circuit L.A.R. 34.1(a)
October 31, 2025

Before: BIBAS, SCIRICA, and SMITH, *Circuit Judges*

(Opinion Filed: February 5, 2026)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

**SMITH**, *Circuit Judge*

## I.

Renee Wolf claims that her former employer, Progressive Pain Management LLC (the "Practice"), the Practice's owner, Dr. Brian Bannister, and its Human Resources Director, Mrs. Penelope Bannister, retaliated against her in violation of the Americans with Disabilities Act ("ADA") and New Jersey Law Against Discrimination ("NJLAD"). Following discovery, the District Court granted the Defendants' motion for summary judgement and ordered the case closed. Because Ms. Wolf fails to establish a *prima facie* case of retaliation, we will affirm the District Court's order.

## II.

In September 2016, Ms. Wolf was hired by the Practice as a physician assistant. While employed by the Practice, Ms. Wolf worked four days a week under the supervision of its owner, Dr. Bannister. Between 2016 and 2021, there were no other doctors or physician assistants working at the Practice apart from Ms. Wolf and Dr. Bannister. The Practice's Office Manager and Director of Human Resources is Dr. Bannister's mother, Mrs. Bannister.

In November 2020, Ms. Wolf traveled to North Carolina to spend Thanksgiving with her parents. While there, her father, who had been diagnosed with cancer earlier in the year, became seriously ill. Rather than return to work, Ms. Wolf chose to remain at her parents' home to care for her parents. On December 5, Ms. Wolf's father passed away, after which she stayed in North Carolina to care for her widowed mother. Through December 18, 2020, Ms. Wolf was able to cover her absence through a combination of

accrued paid time off, sick days, and bereavement leave; however, after that point, she began an unpaid leave of absence.

Ms. Wolf and the Practice kept in contact during her absence. On November 25, Ms. Wolf had notified Dr. Bannister of her father's worsening condition and of her intent to remain temporarily in North Carolina. On December 21, Mrs. Bannister allowed Ms. Wolf to extend her unpaid leave of absence to January 5, 2021. Ms. Wolf also applied, as recommended by the Bannisters, for paid leave through the New Jersey Department of Labor ("NJDOL"). This application, as understood by the Bannisters, would be based upon Ms. Wolf's status as a caregiver rather than any disability. However, rather than seek leave based on her status as a caregiver, Ms. Wolf chose to apply for disability benefits based on her own medical conditions. Her first application, dated December 20, 2020, was not signed by a doctor and contained no information about her claimed disability. Her second application, dated January 4, 2021, was signed and certified by Ms. Wolf's primary care provider ("PCP"), who listed her conditions as including "insomnia" and "panic disorder." JA431-33.

Ms. Wolf's PCP also referred her to psychologist Dr. Joseph Marcantuono, who diagnosed Ms. Wolf with anxiety, panic disorder, and depression. In his January 21 letter to Ms. Wolf's PCP, Dr. Marcantuono noted Ms. Wolf's deteriorating condition since the death of her father and "highly recommend[ed] that she temporarily not return to work at this time, because her premature return to the clinic will likely cause her psychological condition to deteriorate further and possibly to the point of debilitating panic reactions and development of a possible agoraphobic reaction." JA585-86.

3

On March 6, 2021, Ms. Wolf texted Dr. Bannister to update him on her status, advising him that she would be returning to work on April 6. Ms. Wolf included in her correspondence a copy of Dr. Marcantuono's January 21 letter. Dr. Bannister did not respond immediately, leading Ms. Wolf to follow up with him on March 8, 2021, and asking for confirmation that the Practice would allow her to return to work. Dr. Bannister replied: "yes we are fine." JA576.

As agreed, Ms. Wolf returned to the Practice on April 6, 2021. That same day, Ms. Wolf asked whether she would be receiving an annual bonus for 2020, since she had been given one for each preceding year she had been employed there. The Practice, however, had already distributed 2020 bonuses in December, prior to the Christmas holiday. And bonuses had been given to hourly employees only, i.e., everyone other than Ms. Wolf and Dr. Bannister. At first, neither Dr. Bannister nor Mrs. Bannister provided an answer to Ms. Wolf's inquiry about her bonus. But the next day, April 7, Mrs. Bannister explained to Ms. Wolf that the financial effects of Covid-19 were such that the Practice had awarded only small bonuses to hourly staff members. Ms. Wolf protested, to which Mrs. Bannister allegedly responded: "I can't believe that you have the gall to ask for a bonus on your first day back."

On April 8, 2021, Ms. Wolf left work early after notifying the front desk that she was leaving. She did not, however, inform either Dr. Bannister or Mrs. Bannister of her early departure. Displeased with Ms. Wolf's unannounced departure from the doctor's office, Mrs. Bannister called her and allegedly told Ms. Wolf that her behavior was "unacceptable." JA533. She also pointedly told Ms. Wolf: "[y]ou can't come back from

4

leave and ask for a bonus the first day." JA533. Soon after, Mrs. Bannister sent Ms. Wolf an email informing her that her employment was being terminated because she had "abandoned [her] employment position when [she] decided to leave the office . . . without asking permission or notifying Dr. Bannister." JA597.

Ms. Wolf filed the present action in the District of New Jersey on April 3, 2023, asserting disability-related retaliation claims under the ADA and the NJLAD against the Practice, Dr. Bannister, and Mrs. Bannister. After discovery, Defendants moved for summary judgment, which the District Court granted on September 27, 2024. Ms. Wolf timely filed a Notice of Appeal challenging the District Court's grant of summary judgement. We will affirm.

## III.[1]

We review the grant of summary judgement de novo. *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 854 (3d Cir. 2022). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Eisai, Inc. v. Sanofi Aventis U.S., LLC*, 821 F.3d 394, 402 (3d Cir. 2016). A material fact is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). In making that determination we "view the underlying facts and all reasonable inferences therefrom in the

---

[1] The District Court had federal-question jurisdiction over Ms. Wolf's ADA claim under 28 U.S.C. § 1331, and supplemental jurisdiction over the NJLAD claim pursuant to 28 U.S.C. § 1367(a). We have appellate jurisdiction under 28 U.S.C. § 1291.

light most favorable to the party opposing the motion." *Eisai, Inc*., 821 F.3d at 402 (quoting *Montone v. City of Jersey City*, 709 F.3d 181, 189 (3d Cir. 2013)).

Plaintiff's retaliation claims under the ADA and NJLAD are analyzed using the burden-shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Shaner v. Synthes,* 204 F.3d 494, 500 (3d Cir. 2000) (ADA); *Craig v. Suburban Cablevision, Inc.*, 660 A.2d 505, 508–09 (N.J. 1995) (NJLAD). Under *McDonnell Douglas*, a plaintiff first must establish a *prima facie* case of retaliation by showing "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004) (internal quotations omitted), *superseded by statute on other grounds,* ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553, *as recognized in Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 188 n.30 (3d Cir. 2019).

Once a plaintiff establishes her *prima facie* case, the burden shifts to the employer to articulate a "legitimate, non-retaliatory reason" for the adverse employment action. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Finally, should the defendant articulate a legitimate, non-retaliatory reason, the burden shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.*

**IV.**

We begin our analysis by determining whether Ms. Wolf has made out a *prima facie* case for retaliation. First, Ms. Wolf must demonstrate that she engaged in ADA-protected

6

activity. She identifies two instances of potentially protected conduct: (1) requesting a leave of absence for disability, and (2) opposing the Practice's decision to not give her a bonus for 2020.[2] Addressing each in turn, we find that neither instance supports a *prima facie* case of retaliation.

**A.**

Ms. Wolf first argues that her March 2021 text exchange with Dr. Bannister constitutes an ADA-protected request for disability leave. A good faith request for an accommodation, including a leave of absence, is protected activity under the ADA. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003). A good faith request for accommodation does not require the plaintiff to have had a disability within the meaning of the ADA. Instead, she need only show that she had a "reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested." *Williams*, 380 F.3d at 759 n.2.

In determining whether a plaintiff has requested an accommodation we need not engage in a formalistic inquiry. Instead, we look at "whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire

---

[2] Ms. Wolf occasionally frames her protected conduct as *taking* leave until April 2021, rather than simply requesting leave. Such a claim raises unique legal and factual questions, including whether using a reasonable accommodation can constitute protected activity and whether the accommodation was reasonable. Because Ms. Wolf does not squarely present that theory or address those questions here, we will not do so for her.

7

for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

In this case, Ms. Wolf advised her employer in March of 2021 of both her disability and her desire for an accommodation. She notified her employer of her disability on March 6, 2021, when she sent Dr. Bannister a letter from her psychologist listing Ms. Wolf's diagnoses[3] and recommending that she not return to work. Ms. Wolf contends that this letter, coupled with her March 8, 2021, follow-up text asking Dr. Bannister if he would be accepting her back to the Practice, sufficiently transmitted a desire for an accommodation in the form of a leave of absence.

However, even assuming *arguendo* that Ms. Wolf is correct and that she satisfies step one, her *prima facie* case falters at step two.[4] Step two requires "adverse action by the employer *either after or contemporaneous with the employee's protected activity*." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193 (3d Cir. 2015) (citation omitted) (emphasis added). Here the adverse employment action—the Practice's decision to award bonuses only to hourly employees—occurred when bonuses were distributed in December 2020, months before Ms. Wolf's request for accommodation. Because the decision that Ms. Wolf

---

[3] We need not determine whether Ms. Wolf's diagnoses made her a "qualified individual with a disability" under the ADA. *Krouse*, 126 F.3d at 498 ("[A] person's status as a 'qualified individual with a disability' is not relevant in assessing the person's claim for retaliation under the ADA.").

[4] To the extent the District Court held that Ms. Wolf's communications do not constitute ADA-protected activity, we will affirm on alternative grounds. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 904 n.1 (3d Cir. 1997) ("We may affirm the lower court's ruling on different grounds, provided the issue which forms the basis of our decision was before the lower court.").

was not to receive a bonus occurred prior to her protected request for accommodation, Ms. Wolf fails to state a *prima facie* case for retaliation based on this protected activity.[5]

**B.**

Ms. Wolf next argues that she engaged in protected activity by opposing the Practice's decision to deny her a bonus for 2020. We disagree. An informal protest may qualify as protected activity where the employee holds "an objectively reasonable belief, in good faith," that the opposed activity constitutes unlawful discrimination. *See Moore v. City of Philadelphia*, 461 F.3d 331, 341, 343 (3d Cir. 2006), *as amended* (Sept. 13, 2006). "To determine if retaliation plaintiffs sufficiently 'opposed' discrimination, 'we look to the message being conveyed rather than the means of conveyance.'" *Id.* at 343 (citation omitted).

Ms. Wolf avers that, in her April 7 conversation with Mrs. Bannister, she complained that she was not receiving her 2020 bonus "because [she] was on leave at the end of the year." JA531. Although "a victim of retaliation 'need not prove the merits of the underlying discrimination complaint' in order to seek redress,'" *Moore*, 461 F.3d at 344 (citation omitted), a plaintiff must have had an "objectively reasonable belief" that the

---

[5] To the extent Ms. Wolf argues that her termination, as opposed to the denial of a bonus, was in retaliation for her protected request for leave, this fails at least at the causation stage. Ms. Wolf's request for leave cannot be said to be the likely reason for her termination where, as here, Dr. Bannister agreed to provide Ms. Wolf her leave, followed through with allowing her to return to work after her leave, and gave no other indication that her termination resulted from her request. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) ("Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'") (citation omitted).

identified practice constituted unlawful discrimination under the relevant statute. *Id.* at 341. The record reveals no suggestion that Ms. Wolf harbored such a belief.

Ms. Wolf's underlying discrimination complaint was based upon her "leave at the end of [2020]." JA531. However, at no point during 2020 did Ms. Wolf take disability leave, ask the Practice for disability leave, or identify any alleged disability that she communicated to her employer. In fact, most of Ms. Wolf's December leave was taken using PTO, bereavement, and sick days, with the remainder being an unpaid leave of absence.[6] Any belief on the part of Ms. Wolf that she was on protected leave prior to January 2021 would not have been objectively reasonable.

## V.

Because Ms. Wolf fails to make out a *prima facie* showing of retaliation under either theory, we will affirm the District Court's order granting summary judgement.

---

[6] According to her affidavit, Ms. Wolf's complaint to Mrs. Bannister was based, in part, on her view that her "leave did not really start until January 2021," and therefore that she deserved a 2020 bonus. JA531.